UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NICHOLAS J. AECK,	Case No. 12-14046

    Plaintiff,	Honorable Nancy G. Edmunds

v.

GEORGE R. LEONARD,

    Defendant.

_____/

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [15]**

Plaintiff Nicholas Aeck filed this action under 42 U.S.C. §1983, alleging that Defendant, Officer George Leonard of the City of Richmond Police Department, violated Plaintiff's Fourth Amendment rights under color of law, specifically by alleged application of excessive force and malicious prosecution. (Dkt. 1, Pl.'s Compl. ¶¶ 27, 29, 35.) This matter comes before the Court on Defendant's motion for summary judgment. Defendant's motion turns on the question of whether Defendant had probable cause for his warrant request and use of force on Plaintiff. Defendant asserts that he is entitled to qualified immunity, and alternately, that he was justified in using his Taser in light of the rapidly evolving circumstances he confronted. (Dkt. 15, Def.'s Mot. Summ. J. at 10, 15.) Defendant further contends that he did not make, participate in, or influence the decision to prosecute Plaintiff for assault and battery, and that probable cause existed to issue the warrant that Defendant requested. (Def.'s Mot. at 17.) For the reasons stated below, the Court GRANTS Defendant's motion for summary judgment.

**I.      Facts**

   **A.  Defendant's presence in the area**

At around 11:30 p.m. on November 25, 2011, while Defendant and his partner, Officer Michael Duvall were impounding a car following an OUI arrest, they heard pounding, screaming, cursing and slamming sounds from the direction of an adjacent trailer park. (Def.'s Mot., Ex. 1, Police Report at 2-3.) Defendant Leonard and Officer Duvall's testimony on this point remained consistent throughout their police report, deposition testimony and trial testimony. Defendant's police report indicates that nearby bystanders, drawn outside by the police flashers, were pointing to a trailer where Defendant observed a group of individuals fighting on the front porch, including one shirtless male later identified as Plaintiff. (Def.'s Mot., Ex. 1, Police Report at 2; Def.'s Mot., Ex. 2, Duvall Dep. 11:17-11:22, Feb. 1, 2013.) The trailer in question was about 150-200 yards distance from the officers' initial location. (Duvall Dep. 13:4.)

Plaintiff admits his involvement in an altercation but denies that the combatants spilled onto the porch, although he confirms that he opened the front door of the trailer to leave immediately before the fight began. (Def.'s Mot., Ex. 5, Pl.'s Dep. 76:15-76:25, 102:6-102:9, Dec. 6, 2012.) Plaintiff contends that Defendant would not have been able to see the altercation in the dark, but provides no evidence to contradict Defendant's testimony that the trailer park and porch were well-lit. (Pl.'s Resp. at ¶16; Def.'s Mot., Ex. 4, Trial Trans. at 19:16-19:19, Feb. 22, 2012.) Due to the officers' belief that the sounds originated from a domestic disturbance or "some other type of physical altercation," the officers approached the trailer. (Police Report at 2.) While Officer Duvall drove the patrol car around from the apartment complex parking lot to the trailer park

entrance, Defendant ran directly to the trailer through the trailer park, hopping a low fence as he ran. (*Id.* at 3.) Upon arriving, Defendant observed a number of individuals fighting inside the trailer through a plate glass screen door. (*Id.*) Based on his belief that the brawl would result in physical injuries to the combatants, Defendant entered the residence.[1] (*Id.*)

### B. The Incident

After entering the residence, before Officer Duvall had arrived with the patrol car, Defendant asserts that he "immediately yell[ed] police" and loudly instructed the people to "stop fighting" at least three times. (Def.'s Dep. 28:17-29:10; Police Report at 3.) Plaintiff and other witnesses counter that they never heard Defendant announce his presence. (Def.'s Dep. 28:22-29:1; Trial Trans. 54:9-54:13, 84:2-84:4.) The parties dispute whether Plaintiff had removed his iPod, the source of loud music in the trailer, before Defendant entered. Plaintiff testified that he removed his iPod prior to the altercation (Pl.'s Dep. 58:2-58:8.) Defendant testified that the music remained on at a high volume until after he Tasered Plaintiff and turned it off himself. (Trial Trans. 26:11-26:13.) Defendant further testified that the trailer's occupants "weren't paying attention" to him, confirming their failure to hear him announce his presence. (Def.'s Dep. 31:16-17.) Defendant observed Plaintiff, still shirtless, with blood on him and appearing wet, involved in a physical scuffle with at least three male subjects. (Trial Trans. 24:25-25:2.)

---

[1] Although Plaintiff does not expressly allege unlawful entry into the trailer, Defendant Leonard's entry into the trailer relates to his subsequent conduct in Tasing and requesting a warrant for Plaintiff's arrest. *See* Def.'s Dep at 27:6-27:12. *See also Brigham City v. Stuart*, 547 U.S. 398 (2006) (finding warrantless entry proper where police observed a fight through a window under the emergency aid exception).

3

Defendant attempted to stop the altercation by grabbing Plaintiff's leg. (Police Report at 3.) When Plaintiff slipped from Defendant's grasp and the fight continued unabated, Defendant withdrew his Taser. (*Id.*) Defendant testifies that he then shouted "POLICE, STOP, POLICE, STOP FIGHTING" several more times to no effect. (*Id.*) Defendant testified that the shirtless individual then grabbed a female subject, Theresa Alampi, by the collar or hair and drew back his arm as if preparing to strike her in the face with his closed fist. (Trial Trans. 23:19-23:22.) Defendant asserts that he believed serious injury would result from a closed-fist strike to Ms. Alampi's face, and that in order to prevent injury, he announced his intent to Taser Plaintiff. (Police Report at 3.) He then "yelled Tazer [sic] three times as [he] deployed the weapon." (*Id.*)

Defendant's police report explains that although Plaintiff denied attempting to strike Ms. Alampi, he admitted that he "was just going to pretend to hit her" and that "it would have looked like he was going to hurt her, if he did actually strike her." (Police Report at 3.) Plaintiff denies both that he intended to strike Ms. Alampi, and that he made any such statement to Defendant. (Pl.'s Dep. at 103:23-103:25.) Witnesses testified at Mr. Aeck's criminal trial that they did not observe Plaintiff make any move to strike Ms. Alampi. (Trial Trans. 54:17-55:25; 83:13-83:21.) Ms. Alampi herself testified that Mr. Aeck never attempted to strike her, and that Defendant's statement to the contrary constituted a lie under oath. (Trial Trans. 60:25-61:11.)

After the Taser prongs lodged in the center of Plaintiff's torso and lower back, Plaintiff's muscles tensed as he fell to the ground. (Trial Trans. at 25:17-25:18, 25:22-25:24.) Defendant allowed the Taser to complete one five-second cycle and subsequently removed the Taser prongs from Plaintiff's back. (Trial Trans. at 27:2-

4

27:4.) After Defendant Tasered Plaintiff, the fight ceased. (Police Report at 3.) Defendant did not apply any other force to any occupant or to Plaintiff after the fight ended.

In his subsequent Use of Force Report, Defendant reports that he applied nonlethal force in order to defend another person. (Def.'s Dep. 79:5-79:8.) The Richmond Police Department's Use of Force Policy indicates that subjects "shall not be subjected to physical force other than as may be necessary in the prevention of an escape, in self-defense, or in the prevention of violence to another person." (Def.'s Dep., Ex. 4, Force Policy at 1.) Richmond's Taser Deployment Policy further specifies that "Unless it is impractical, unreasonable, or dangerous to do so, a verbal warning shall be given before a Taser is deployed." (Def.'s Dep., Ex. 5, Taser Policy at 1.) Richmond's Taser Deployment Policy does not require that the subject actually hear an officer's verbal warning prior to deployment. (*Id.*)

Taser Deployment Policy also requires officers to summon EMS only when the subject presents with "breathing difficulties, profuse sweating, and loss of consciousness" following Taser use, or when the subject requests medical attention. (Taser Policy at 2.) Defendant summoned EMS, despite Plaintiff's assertions that he did not require medical attention. (Police Report at 3; Pl.'s Dep. at 86-87; Def.'s Mot., Ex. 7, EMS Run Sheet.) Plaintiff can be heard on audio recording from the officers' patrol car indicating that he was "good," except for the fact that his "lips were tingling a little bit." (Def.'s Mot., Ex. 6, DVD of Audio After Taser ("DVD") 46:08-46:12.)[2]

---

[2] The Court was able to hear audio from the submitted DVD but could not view any video footage.

After reporting his Taser use to dispatch, verifying identification of all the people known to be inside the trailer, checking for alcohol related violations, and having Plaintiff cleared by EMS, Defendant asked all occupants if they wanted to press any charges for "assault…trespassing, unwanted guest, MDOP or any other charges," but all declined. (Police Report at 4; Trial Trans. 33:13-33:14.) The officers ensured that Plaintiff left the premises as requested by Ms. Alampi. (Police Report at 4.) Officers Leonard and Duvall subsequently left the trailer without taking anyone into custody. (*Id.*)

### C. Criminal Prosecution

None of the trailer's occupants wanted to press charges, so Defendant Leonard requested only a warrant for Disorderly Conduct against Plaintiff, based on his own complaint. (Police Report at 4; Def.'s Mot. Ex. 8, Warrant Req. at 1.) Defendant testified that he believed probable cause existed to arrest a number of people for a variety of offenses ranging from assault and battery to disturbing the peace. (Def.'s Dep. 55:25-56:13.) Defendant based his warrant request on the initial disturbance, which he asserts took place outside of the trailer, the noise of which drew the officers to the location. (*Id.* at 62:6-62:9.) The record does not indicate that the warrant request relies on the outdoor altercation. (*Id.* at 62:12-62:14.) Defendant believed, based on witness statements and his personal observations, that Plaintiff instigated the conflict and represented the most physically aggressive combatant. (*Id.* at 64:12, 62:15-62:16, 72:22-72:23.)

Other party attendees confirmed that Plaintiff's sexually charged and racially provocative comments to his girlfriend, Halli Alampi,[3] triggered the altercation. (Trial Trans. 45:15-45:20, 51:6-51:11, 68:15-68:17.) The record also confirms that Plaintiff was the only combatant asked to leave in Defendant's presence. (*Id.* at 33:13-33:15.) Defendant subsequently turned his warrant request and police report over to supervising Detective Julia Franz, who forwarded them to the city prosecutor, Mr. Mark Clark. (Def.'s Mot., Ex. 9, Mark Clark Aff., ¶ 6, Mar. 25, 2013; Def.'s Dep. at 48-49; Def.'s Mot. at 9.) Mr. Clark did not contact Defendant upon receiving his request, despite the fact that Defendant's warrant request was admittedly ambiguous. (Def.'s Dep at 63:11-63:13.)

On December 20, 2011, Mr. Clark issued a misdemeanor warrant for assault and battery against Plaintiff. (Police Report at 4.) Richmond Code of Ordinances defines assault and battery as when any person "with force and violence [does] a corporal hurt to another, or assault and/or batter any other person." (Def.'s Mot., Ex. 9C, Ordinance Excerpts Sec. 54-146.) The Richmond Police Department informed Plaintiff's probation officer of the warrant on December 21, 2011; Plaintiff's probation officer communicated her intent to notify police for arrest when Plaintiff reported to her on January 9, 2012. (Police Report at 4.) Plaintiff turned himself in to Macomb County Jail on January 12, 2012, and a jury trial was set for February 22, 2012. (*Id.* at 4-5.) Plaintiff testified that he spent one night in jail. (Pl.'s Dep. 37:14-37:17.)

---

[3] Throughout the record, Ms. Alampi's name has been spelled multiple ways (*eg.* Trial Trans. 51:13 "Halley"), the Court chooses to use Halli for consistency, as indicated by Plaintiff in his Deposition. (Pl.'s Dep at 11:14-11:15.)

Defendant did not learn that the prosecutor had issued a warrant for assault and battery for Plaintiff, as opposed to the disturbing the peace / disorderly conduct warrant that Defendant requested, until called to testify at Plaintiff's criminal trial. (Def.'s Mot., Ex. 9B Misdemeanor Warrant ("Warrant"); Def.'s Dep. at 72-73.) The jury found Plaintiff not guilty of assault and battery. (Trial Trans. at 91:20-91:21.)

Disputed facts include whether Plaintiff removed his iPod, ceasing the music before Defendant entered the trailer, whether the combatants ever spilled onto the front porch, whether Defendant announced his presence and intent to Taser Plaintiff, and finally whether Defendant reasonably believed that Plaintiff was about to strike Ms. Alampi in the face.

## II.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Revised Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

8

Fed. R. Civ. P. 56(c)(1).

When the moving party has met its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

**III. Analysis**

On Defendant's motion for summary judgment, the Court resolves all factual disputes in favor of Plaintiff. The Court assumes *arguendo*: first, that the music was off before Defendant entered the trailer; second, that the fight never spilled onto the front porch; and third, that Plaintiff did not physically threaten or menace Ms. Alampi. Plaintiff also asserts that nobody present in the trailer heard Defendant announce his presence, or warn prior to Taser deployment. (Pl.'s Resp. at 16, 18.) Plaintiff does not claim that Defendant never announced his presence, only that the trailer occupants did not hear him do so. It is therefore possible that Defendant announced his presence and, even without loud music playing, the noise created by an admitted group altercation prevented the trailer's occupants from hearing Defendant's warnings. Undisputed evidence that the noise emanating from the trailer drew the officers from a distance of at least 150 yards supports this conclusion. (Police Report at 3.) Resolution of these facts

9

in Plaintiff's favor does not materially impact the Court's analysis of Plaintiff's substantive claims or of Defendant's qualified immunity assertion.

To state a valid claim under §1983, the plaintiff must set forth sufficient facts to "establish the deprivation of a right secured by the Constitution or laws of the United States…caused by a person acting under the color of state law." *Miller v. Sanilac County*, 606 F.3d 240, 247 (6th Cir. 2010) (quoting *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)). The Court finds that Plaintiff cannot establish either an excessive force claim or a malicious prosecution claim, and that regardless, Defendant enjoys qualified immunity. Plaintiff's excessive force claim fails because Defendant's use of the minimal force required to end a physical altercation was reasonable under the circumstances. Plaintiff's malicious prosecution claim should fail because probable cause existed to arrest Plaintiff for any number of charges.

In examining a police officer's qualified immunity claim, the Court applies the standard set forth in *Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009). *McCarty v. Gatz*, No. 07-15460, 2009 WL 1664462, at *8 (E.D. Mich. Jun. 15, 2009) (Edmunds, J.). Traditionally, a qualified immunity claim protects government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 227 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)). Qualified immunity is "immunity from suit rather than a mere defense to liability." *Pearson*, 555 U.S. at 231 (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

**A. Excessive Force**

Plaintiff's claim that Defendant's deployment of a Taser against him constituted unlawful and excessive force fails based on the reasonableness of Defendant's conduct under the circumstances. "All claims that law enforcement officials have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 386 (1989). The Court must determine:

> whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them without regard to their underlying intent or motivation. The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, and its calculus must embody an allowance for the fact that police officers are often forced to make split-second decisions about the amount of force necessary in a particular situation.

*Graham*, 490 U.S. at 387. *See Miller v. Sanilac County*, 606 F.3d 240, 251 (6th Cir. 2010) (applying *Graham*). The Supreme Court also set forth three factors that the Court must consider when analyzing an excessive force claim: the severity of the crime, any threat to the safety of police officers or others, and whether the subject attempted to resist arrest or evade by flight. *Graham*, 490 U.S. at 396.

The parties agree that upon Defendant's entry, multiple individuals were engaged in a loud physical altercation. Plaintiff does not dispute that he had blood on him, one individual had a bloody nose, there was blood on the walls, and a hole in one wall where a combatant's head struck the wall during the course of the fight. (Police Report at 2, 4.) A reasonable police officer in Defendant's position could determine that force was necessary to stop the conflict from escalating and prevent further injury. The

11

officer's conduct "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Morrison v. Bd. of Tr. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009) (citing *Graham*, 490 U.S. at 396).

Defendant correctly relies on *Esters v. Steberl*, 93 F. Appx. 711 (6th Cir. 2004), where the Sixth Circuit found use of pepper spray not excessive against an individual later determined not to be the instigator of the physical altercation. This court analogized Taser use to pepper spray use in *Perach v. Lee*; consequently cases involving pepper spray are instructive here. No. 08-13754, 2009 WL 3190414 (E.D. Mich. Sept. 30, 2009) (Cook, J.). In *Perach*, the court applied pepper spray case law to find excessive force where officers Tasered a fleeing college student twice after he tripped and fell to the ground. 2009 WL 3190414, at *7-8.

In *Esters*, Ms. Pemberton created a disruption at a bingo game upon discovering that her car was blocked in, at which time witnesses summoned police. *Esters*, 93 F. Appx. at 712. Officer Steberl, the responding officer, agreed to allow Ms. Pemberton to complete her bingo game. *Id.* at 713. Ms. Pemberton returned inside and subsequently exchanged words with Ms. Esters; Ms. Pemberton then struck Ms. Esters, initiating a "frenzied hair-pulling contest." *Id.* Although several witnesses explained to Officer Steberl that Ms. Esters did not provoke the altercation, the officer sprayed both women with pepper spray before transporting them to the police station, where Ms. Esters was charged with disorderly conduct. *Id.* In this case, Defendant similarly came upon a number of individuals engaged in physical combat, and applied such force as he thought reasonably necessary, in light of the circumstances, to reinstate order.

Plaintiff relies on *Baker v. City of Hamilton* to establish that "the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law." 471 F.3d 601, 607-08 (6th Cir. 2006). Plaintiff also argues that he was "not engaged in any unlawful activity that would require any use of force." (Pl.'s Resp. at 24, 27.) The record does not indicate that Plaintiff was engaged in entirely innocent party activities, but rather indicates that Plaintiff was involved in a physical altercation. In *Shreve v. Jessamine Cty. Fiscal Court*, the court found excessive force where the defendant police officer repeatedly kneed a subject in the back and struck the subject with his baton while the subject was prone on the ground after having been incapacitated by pepper spray. 453 F.3d 681, 687 (6th Cir. 2006). Plaintiff fails to draw any factual similarity to other cases where a police officer's use of force was found excessive in violation of the Fourth Amendment due to the subject's incapacitation or neutralization.

This Court has previously found Taser use excessive due to the subject's neutralization or incapacitation where the subject was Tasered after being shot multiple times by police officers, while lying prone on the ground. *McCarty*, 2009 WL 1664462. An officer also applies excessive force when he pepper sprays a subject who is not resisting and has not been told that that he is under arrest. *Grawey v. Drury*, 567 F.3d 302 (6th Cir. 2009). Pepper spray use was found to constitute excessive force where a defendant officer pepper sprayed a subject who was handcuffed and prone on the ground, although still squirming and kicking his feet in the air. *Champion v. Outlook Nashville*, 380 F.3d 893, 901 (6th Cir. 2004). Although Plaintiff repeatedly asserts that he had "submitted, [was] not resisting, and [was] no danger to anyone," the evidence does not support these assertions. (Pl.'s Resp. at 26.) Plaintiff was not handcuffed, had

13

not stopped fighting, and had not responded to Defendant's requests to stop fighting. Plaintiff does not allege that Defendant continued to apply force after subduing Plaintiff with the Taser.

Plaintiff also implies that the short duration of time between Defendant Leonard's initial awareness of the conflict and his Taser deployment (around 90 seconds) indicates that Defendant's use of force must be unlawful. (Pl.'s Resp. at 26; *see* DVD.) This jurisdiction has not adopted a *per se* rule designating rapid use of force unlawful. *Graham* in fact requires the Court to take into consideration the "fact that police officers are often forced to make split-second decisions about the amount of force necessary in a particular situation." *Graham*, 490 U.S. at 387. Since Plaintiff fails to show Defendant's conduct objectively unreasonable under the circumstances, the Court GRANTS summary judgment on Plaintiff's excessive force claim.

### B. Malicious Prosecution

Although the Supreme Court in *Wallace v. Kato*, 548 U.S. 384 (2009) declined to settle the law regarding §1983 claims based on malicious prosecution, the Sixth Circuit recognizes malicious prosecution that "encompasses wrongful investigation, prosecution, conviction and incarceration." *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) (quoting *Barnes v. Wright*, 449 F.3d 709, 715-16 (6th Cir. 2006)). The Sixth Circuit requires Plaintiff to prove four elements:

> 1. that Defendant "ma[d]e, influence[d], or participate[d] in the decision to prosecute" Plaintiff;
> 2. there was a failure of probable cause for criminal prosecution;
> 3. Plaintiff suffered deprivation of liberty apart from the initial seizure as a result of the prosecution; and,
> 4. that the criminal matter was later resolved in Plaintiff's favor.

*Sykes*, 625 F.3d at 308-09 (quoting *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007)).

Michigan law requires proof of an animus of malice or purpose other than the pursuit of justice to support a malicious prosecution claim under state law. *Alman v. Reed*, 703 F.3d 887, 902 (6th Cir. 2013) (citing *Matthews v. Blue Cross & Blue Shield of Michigan*, 572 N.W.2d 603, 609 (Mich. 1998)). The Sixth Circuit, however, declined to rule on whether a federal court must apply the Michigan state law standard where plaintiff asserts both state and federal malicious prosecution claims. *Miller v. Sanilac County*, 606 F.3d 240, 247 (6th Cir. 2010). In this case, since Plaintiff asserts only federal claims under §1983, the Court applies the federal standard.

### 1. Defendant Did Not Influence the Decision to Prosecute Plaintiff

Plaintiff fails to show that Defendant influenced the decision to prosecute Plaintiff. Plaintiff argues that Defendant's allegedly false statements caused Mr. Clark to prosecute Plaintiff for assault and battery. (Compl. ¶36(i)-(o).) Defendant's conduct consisted solely in describing the conduct that he observed and submitting it to his superiors. Mr. Clark testified that he "did not discuss either the Warrant Request or Police Report with Officer Leonard while making [his] independent prosecutorial decision as to whether to charge Mr. Aeck with a misdemeanor ordinance violation." (Clark Aff., ¶ 6.) Mr. Clark also indicated his desire to issue a warrant based on "the most egregious of the actions allegedly committed by Mr. Aeck." (*Id.*, ¶ 9.)

Even assuming *arguendo* that Defendant's report and warrant request contained misstatements of fact, the Sixth Circuit requires a plaintiff to prove that the impact of a defendant's "misstatements and falsehoods in his [or her] investigatory materials extended beyond the [plaintiff's] initial arrest and ultimately influenced the [plaintiff's] continued detention." *Sykes*, 625 F.3d at 316. *See Tobias v. Pletzke*, 12-10818, 2013

WL 1156492 (E.D. Mich. Mar. 20, 2013) (Ludington, J.). Mr. Clark identified a variety of other warrants supported by Defendant's warrant request and police report. (Clark Aff., ¶ 10(a)-(b).) Plaintiff does not contest his probation violation, later issued for alcohol consumption on the night of the incident. (Pl.'s Dep. 35:22-36:5.) Plaintiff does not prove that Defendant made or influenced the decision to prosecute him for assault and battery.

Because Plaintiff fails to meet the first prong of the malicious prosecution test under *Sykes*, the Court need not consider the remaining three factors. Therefore, the Court GRANTS summary judgment in favor of Defendant on Plaintiff's malicious prosecution claim.

### C. The Court Affords Defendant Qualified Immunity as to Both Claims

#### 1. Standard

Although the Supreme Court in *Pearson v. Callahan*, 555 U.S. 223 (2009) affords lower courts discretion to consider the two prongs of qualified immunity analysis together or separately, the Sixth Circuit continues to follow the traditional two-step analysis set forth in *Saucier v. Katz*, 533 U.S. 201 (2001). *Grawey*, 567 F.3d at 309. *Saucier* requires the injured party to satisfy the threshold question of whether the defendant's conduct violated a constitutional right, before moving to the secondary question of whether that right was firmly established at the time of the incident. *Saucier*, 533 U.S. at 201. *See Phillips v. Roane County, Tenn.*, 534 F.3d 531, 538-39 (6th Cir. 2008) (enumerating the Sixth Circuit standard for qualified immunity claims). *Pearson* also sets forth, not subject to the lower court's discretion, that whether the officer's conduct resulted from "a mistake of law, a mistake of fact, or a mistake based on mixed

questions of law or fact" does not bear on the validity of a qualified immunity claim. *Pearson*, 555 U.S. at 231 (adopting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J. dissenting)).

A qualified immunity claim succeeds if the law at the time of the incident did not clearly establish that the officer's conduct would violate the injured party's constitutional rights, and the right in question was clearly established. *Saucier*, 553 U.S. at 201. Plaintiff cites *Jones v. City of Cincinnati*, 521 F.3d 555 (6th Cir. 2008) to illustrate application of the qualified immunity standard at the summary judgment stage. (Pl.'s Resp. at 29.) At this stage, the defendant enjoys qualified immunity if the facts would not allow a reasonable juror to find that the plaintiff satisfies these two prongs. *Jones*, 521 F.3d at 559. The qualified immunity standard is a broad one, designed to protect "all but the plainly incompetent or those who knowingly violate the law." *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Notwithstanding the Court's determination that no constitutional violation occurred, the Court finds Defendant entitled to qualified immunity because Plaintiff fails to prove that Defendant's conduct was either knowing or incompetent.

### 2. Analysis

As to Plaintiff's excessive force claim, Plaintiff fails to establish a violation of his constitutional rights under the objective reasonableness standard set forth in *Graham*. Plaintiff does not prove that Defendant had any prior notice that his use of a Taser in a rapidly evolving and admittedly violent confrontation would violate Plaintiff's rights. Defendant's application of force complied with the Richmond Police Department's Use of Force Policy and Taser Use Policy.

For a malicious prosecution claim, the qualified immunity standard requires "such an utter lack of probable cause that no officer of reasonable competence would have concluded that a warrant should issue." *Garcia v. Thorne*, No. 12-1774, 2013 WL 1136552, at *4 (6th Cir. Mar. 19, 2013) (internal citations omitted). Plaintiff does not meet this initial burden of proof to defeat qualified immunity.

## IV.    Conclusion

For the foregoing reasons, the Court GRANTS summary judgment in favor of Defendant as to both Plaintiff's malicious prosecution and excessive force claims.


                    s/Nancy G. Edmunds
                    Nancy G. Edmunds
                    United States District Judge

Dated:  July 18, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on July 18, 2013, by electronic and/or ordinary mail.

                    s/Johnetta M. Curry-Williams
                    Case Manager
                    Acting in the Absence of Carol A. Hemeyer